NEAL S. ZASLAVSKY (SBN 277543)
  neal@nszlegal.com
**LAW OFFICE OF NEAL S. ZASLAVSKY,**
**A PROFESSIONAL CORPORATION**
8335 Sunset Boulevard, Suite 101
West Hollywood, California 90069
Telephone: (323) 389-1881
Facsimile: (323) 389-1885

*Attorneys for Plaintiff,*
*Neal S. Zaslavsky*

## UNITED STATES DISTRICT COURT

## FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| **NEAL S. ZASLAVSKY**, an individual, <br><br> Plaintiff, <br><br> v. <br><br> **CONSUMER ATTORNEYS ASSOCIATION OF LOS ANGELES**, a California non-profit corporation; **MINH TRI NGUYEN, ESQ.**, an individual; **IBIERE SECK, ESQ.**, an individual; **MARTIN ISAAC AARONS, ESQ.**, an individual; **ELIZABETH ANNE HERNANDEZ, ESQ.**, an individual; **CHRISTA HAGGAI RAMEY, ESQ.**, an individual; **DAN ABIR, ESQ.**, an individual; **KATHRYN MARIE TREPINSKI, ESQ.**, an individual; **DAVID HOFFMAN, ESQ.**, an individual; **KEITH LaSALLE ALLEN, ESQ.**, an individual; **SAMER SAMI HABBAS, ESQ.**, an individual; **STEPHEN MASHNEY, ESQ.**, an individual; **KWEDI MOORE**, an individual; and **DOES 1-10**, inclusive, <br><br> Defendants. | Case No. <br><br> **COMPLAINT FOR:** <br><br> **(1)** **UNLAWFUL DISCRIMINATION IN PUBLIC ACCOMMODATION IN VIOLATION OF 42 U.S.C. § 2000a;** <br><br> **(2)** **UNLAWFUL DISCRIMINATION IN VIOLATION OF THE UNRUH CIVIL RIGHTS ACT, CAL. CIV. CODE §§ 51, 52;** <br><br> **(3)** **DISCRIMINATION IN BUSINESS DEALINGS, IN VIOLATION OF CAL. CIV. CODE §§ 51.5;** <br><br> **(4)** **THREATS OF VIOLENCE IN VIOLATION OF THE RALPH CIVIL RIGHTS ACT, CAL. CIV. CODE §§ 51.7;** |

**(5)** **VIOLATIONS OF THE BANE ACT, CAL. CIV. CODE §§ 52.1;**

**(6)** **INTENTIONAL INTERFERENCE WITH PROSPECTIVE ECONOMIC RELATIONS;**

**(7)** **NEGLIGENT INTERFERENCE WITH PROSPECTIVE ECONOMIC RELATIONS**

<u>**JURY TRIAL DEMANDED ON ALL CAUSES OF ACTION TRIABLE BY JURY**</u>

**COMES NOW,** Plaintiff **NEAL S. ZASLAVSKY**, an individual, who hereby complains against Defendants **CONSUMER ATTORNEYS ASSOCIATION OF LOS ANGELES**, a California non-profit corporation; **MINH TRI NGUYEN, ESQ.,** an individual; **IBIERE SECK, ESQ.**, an individual; **MARTIN ISAAC AARONS, ESQ.**, an individual; **ELIZABETH ANNE HERNANDEZ, ESQ.**, an individual; **CHRISTA HAGGAI RAMEY, ESQ.**, an individual; **DAN ABIR, ESQ.**, an individual; **KATHRYN MARIE TREPINSKI, ESQ.**, an individual; **DAVID HOFFMAN, ESQ.**, an individual; **KEITH LaSALLE ALLEN, ESQ.**, an individual; **SAMER SAMI HABBAS, ESQ.**, an individual; **STEPHEN MASHNEY, ESQ.**, an individual; **KWEDI MOORE**, an individual; and **DOES 1 through 10 inclusive**, and alleges, upon personal knowledge as to himself and his own acts, and upon information and belief as to all other matters, as follows:

## JURISDICTION AND VENUE

1.      This Court has subject matter jurisdiction over this case based on federal question jurisdiction, as Plaintiff has brought claims arising under 42 U.S.C.A. § 2000a.

2.      This Court has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C.A. § 1367, as each of the aforesaid state law claims are so related to claims in the action within this Court's original jurisdiction that they form part of the same case or controversy.

3.      Venue is proper in this district pursuant to 28 U.S.C. § 1391(b) in that the substantial part of the activities giving rise to the claims alleged herein occurred within this district.  The Plaintiff and each of the Defendants also resides in or is domiciled in this district.

///
///
///

COMPLAINT FOR DAMAGES

# THE PARTIES

**Plaintiff**

4.     Neal S. Zaslavsky ("**MR. ZASLAVSKY**") is a natural person currently residing in, and at all times relevant did reside in Los Angeles County, California. **MR. ZASLAVSKY** is a licensed attorney, and is admitted to practice in all state courts in California, the Central District of California, the Northern District of California, and the Ninth Circuit Court of Appeals.  **MR. ZASLAVSKY** has also been admitted *pro hac vice* to the Northern District of Illinois.

5.     **MR. ZASLAVSKY** first joined the **CONSUMER ATTORNEYS ASSOCIATION OF LOS ANGELES ("CAALA")** during the 2008-2009 academic year, while he was still a student in the SCALE program at Southwestern Law School. **MR. ZASLAVSKY** has attended every **CAALA** annual convention since joining (except 2020 when COVID forced the cancellation of the event) and was already registered for the 2023 conference at the time that the actions complained of herein occurred.

6.     **MR. ZASLAVSKY** was very active in **CAALA**, providing countless documents for **CAALA**'s document bank, actively participating in the work-product list serve (and often providing extensive briefing and research to various members, both through the list serve and off line).  **MR. ZASLAVSKY** participated in various **CAALA** events and programs, judging several law school competitions, mentoring younger lawyers, and volunteering as a mediator for the former PISC settlement program.  **MR. ZASLAVSKY** was also on the list of **CAALA** discounted mediators, and **MR. ZASLAVSKY** has helped many **CAALA** members successfully resolve their cases without the need for a time-consuming and costly trial.

7.     Law is a third career for **MR. ZASLAVSKY**, as he started law school just a few days after his 40th birthday.  Prior to law school, he worked as a management and political consultant, and before that, he had a teaching fellowship

COMPLAINT FOR DAMAGES

and taught political science at a major research university while working on his Ph.D. in political science.

8.     **MR. ZASLAVSKY** has also advised political campaigns ranging from local initiatives and municipal elections, all the way up to presidential contests.  Even today, he is still the personal attorney to many current and former elected officials here in California.

9.     Advocacy is in **MR. ZASLAVSKY's** blood.  **MR. ZASLAVSKY** learned very early in life that basic human rights are always worth fighting for.  Much of this came from his grandfather, who – after being run out of his teaching job at a small college in the Ozarks (Meena, Arkansas) for the "crime" of dating a woman of color – joined 1500 other Americans in the Abraham Lincoln Brigade in 1936 and went to Spain – against the wishes of our government – to fight against fascism in Europe, and in particular against dictator Francisco Franco in Spain, who Adolf Hitler was using to test many of the weapon systems he would ultimately use in his savage invasions of the rest of Europe leading up to and during World War II.

10.     As a child, **MR. ZASLAVSKY's** grandfather would often take him to his monthly meetings of the Veterans of the Abraham Lincoln Brigades, where he was instilled with many of the values he still carries with him today.  **MR. ZASLAVSKY** also had the opportunity in 1988 to accompany his grandfather back to Barcelona, Spain for the 50th anniversary of the expulsion of the International Brigades from Europe, and had the opportunity to meet and learn from an entire generation of international freedom fighters.

11.     One of **MR. ZASLAVSKY's** earliest memories of his activism was from when he was just 10 years old.  After then-New Jersey Governor Brendan Byrne slashed education budgets as part of his 1978 scheme, teachers – including **MR. ZASLAVSKY's** late mother – formed picket lines in front of local schools.  **MR. ZASLAVSKY** joined his mother, and as the youngest person on that picket line, he was interviewed by the regional newspaper.  In his interview, **MR. ZASLAVSKY**

condemned the budget and the lawmakers supporting draconian cuts to education. Since this was back in the day when journalists actually tried to be balanced, the reporter reached out to the head of the Assembly budget committee for a response to **MR. ZASLAVSKY's** comments.  The gist of his response was that **MR. ZASLAVSKY's** opinion did not matter because he was a "child" who could not vote. A public outcry ensued, and **MR. ZASLAVSKY** was ultimately invited – as that representative's guest – to sit with him on the floor of the New Jersey General Assembly when they voted to restore some of the education funding.  **MR. ZASLAVSKY** received not just a sincere apology and a limousine ride to Trenton, but more importantly, he learned the valuable lesson to always stand up for what is right.  Nearly 45 years later, **MR. ZASLAVSKY** still carries that lesson with him.

12.     Over the course of **MR. ZASLAVSKY's** career, this has manifested itself in many ways.  In addition to his work with **CAALA**, he served as President of his local Rotary Club, volunteered at various legal aid clinics specializing in tenants' rights, sat on various public service boards, including the West Hollywood Library Foundation, has been a political appointee to various city commissions, served on the Board of Directors of the West Hollywood Chamber of Commerce for 7 years, serves as an active Barrister in his Inn of Court, and while in law school, received distinction for public service upon graduation, after performing more than 75 hours of public service during just his last year of law school.

13.     While in law school, **MR. ZASLAVSKY** also had the life-changing opportunity to serve as a law clerk for the *Defensoria General ante la Corte Suprema de Justicia de la Nación Argentina* (Supreme Court of Argentina).  This has provided **MR. ZASLAVSKY** with the opportunity to guest lecture at law schools and publish certain legal writings in Argentina on various civil rights topics.

14.     **MR. ZASLAVSKY** has also been extremely active in the American Association for Justice (AAJ), where he presently serves on the executive board of the

COMPLAINT FOR DAMAGES

Business Torts sections, and is serving his first term as a presidential appointee on the Diversity, Equity, and Inclusion ("DEI") committee.

**Defendants**

15.     Defendant **CONSUMER ATTORNEYS ASSOCIATION OF LOS ANGELES**, a California non-profit corporation ("**CAALA**") is a business located in Los Angeles, California.  **CAALA** bills itself as the nation's largest local association of plaintiffs' attorneys, with more than four thousand members.

16.     Defendant **MINH TRI NGUYEN, ESQ.,** an individual ("**MR. NGUYEN**"), is a licensed attorney in the State of California, bearing California State Bar number 222405, currently in good standing.  **MR. NGUYEN** resides in and maintains his business in Los Angeles County, California, within this district.  **MR. NGUYEN** is also the 2023 President of Defendant **CAALA**.  **MR. NGUYEN** is the founder and owner of Nguyen Theam Lawyers, LLP, which is a sponsor and major financial supporter of Defendant **CAALA.**

17.     Defendant **IBIERE SECK, ESQ.**, an individual ("**MS. SECK**"), is a licensed attorney in the State of California, bearing California State Bar number 256198, currently in good standing.  **MS. SECK** resides in and maintains her business in Los Angeles County, California, within this district.  **MS. SECK** is also the 2023 President-Elect of Defendant **CAALA**.

18.     Defendant **MARTIN ISAAC AARONS, ESQ.**, an individual ("**MR. AARONS**"), is a licensed attorney in the State of California, bearing California State Bar number 233879, currently in good standing.  **MR. AARONS** resides in and maintains his business in Los Angeles County, California, within this district.  **MR. AARONS** is also the 2023 Vice-President of Defendant **CAALA**.

19.     Defendant **ELIZABETH ANNE HERNANDEZ, ESQ.**, an individual ("**MS. HERNANDEZ**"), is a licensed attorney in the State of California, bearing California State Bar number 204322, currently in good standing.  **MS.**

**HERNANDEZ** resides in and maintains her business in Los Angeles County, California, within this district. **MS. HERNANDEZ** is also the 2023 Second Vice President of Defendant **CAALA**.

20.   Defendant **CHRISTA HAGGAI RAMEY, ESQ.**, an individual ("**MS. RAMEY**"), is a licensed attorney in the State of California, bearing California State Bar number 210238, currently in good standing. **MS. RAMEY** resides in and maintains her business in Los Angeles County, California, within this district. **MS. RAMEY** is also the 2023 Treasurer of Defendant **CAALA**. **MS. RAMEY** is a frequent legal commentator on local and national television. Both **MS. RAMEY**, as well as her husband, John F. Ramey, Esq. (who is not presently named as a defendant herein) are employed by Abir Cohen Treyzon Salo, LLP (commonly known as "**ACTS LAW**"). **ACTS LAW** was retained on or about May 4, 2020 by **MR. ZASLAVSKY** and **ACTS LAW** did indeed actively represent **MR. ZASLAVSKY** and his firm in a business matter up through and including 2022.

21.   Defendant **DAN ABIR, ESQ.**, an individual ("**MR. ABIR**"), is a licensed attorney in the State of California, bearing California State Bar number 177358, currently in good standing. **MR. ABIR** was, however, suspended from the practice of law in California for the fourteen (14) month period between September 27, 1999 and November 16, 2000. **MR. ABIR** resides in and maintains his business in Los Angeles County, California, within this district. **MR. ABIR** is also the 2023 Secretary of Defendant **CAALA**. **MR. ABIR** is founder and named partner in Abir Cohen Treyzon Salo, LLP (commonly known as "**ACTS LAW**"). **ACTS LAW** was retained on or about May 4, 2020 by **MR. ZASLAVSKY** and **ACTS LAW** did indeed actively represent **MR. ZASLAVSKY** and his firm in a business matter up through and including 2022.

22.   Defendant **KATHRYN MARIE TREPINSKI, ESQ.**, an individual ("**MS. TREPINSKI**"), is a licensed attorney in the State of California, bearing California State Bar number 118378, currently in good standing. **MS. TREPINSKI**

resides in and maintains her business in Los Angeles County, California, within this district. **MS. TREPINSKI** is also a member of the Board of Governors of Defendant **CAALA**.

23.     Defendant **DAVID HOFFMAN, ESQ.**, an individual ("**MR. HOFFMAN**"), is a licensed attorney in the State of California, bearing California State Bar number 140557, currently in good standing. **MR. HOFFMAN** resides in and maintains his business in Los Angeles County, California, within this district. **MR. HOFFMAN** is also a member of the Board of Governors of Defendant **CAALA**.

24.     Defendant **KEITH LaSALLE ALLEN, ESQ.**, an individual ("**MR. ALLEN**"), is a licensed attorney in the State of California, bearing California State Bar number 187976, currently in good standing. **MR. ALLEN** was suspended twice from the practice of law in California, in 2011 and 2012, both times for failure to pay court ordered child and family support. **MR. ALLEN** resides in and maintains his business in Orange County, California, within this district. **MR. ALLEN** is also a member of Defendant **CAALA**.

25.     Defendant **SAMER SAMI HABBAS, ESQ.**, an individual ("**MR. HABBAS**"), is a licensed attorney in the State of California, bearing California State Bar number 243683, currently in good standing. **MR. HABBAS** resides in and maintains his business in Orange County, California, within this district. **MR. HABBAS** is also a member of Defendant **CAALA**.

26.     Defendant **STEPHEN MASHNEY, ESQ.**, an individual ("**MR. MASHNEY**"), is a licensed attorney in the State of California, bearing California State Bar number 162675, currently in good standing. **MR. MASHNEY** resides in and maintains his business in Orange County, California, within this district. **MR. MASHNEY** is also a member of Defendant **CAALA**.

27.     Defendant **KWEDI MOORE**, an individual ("**MS. MOORE**") resides in and is employed in Los Angeles County, California, within this district. **MS. MOORE** is also the Executive Director of Defendant **CAALA**.

28.   **MR. ZASLAVSKY** is informed and believes, and based thereon alleges, that at all times relevant to this Complaint, the Defendants, and each of them, were acting as the agent, servant, employee, subsidiary, joint venturer, affiliate, partner, assignee, successor-in-interest, *alter ego*, or other representative of each other, and were acting within the course and scope of their agency, servitude, employment, subsidy, joint venture, affiliation, partnership, assignment, succession, *alter ego*, and/or representation, with the full knowledge, consent, permission, authorization and ratification, either express or implied, of each of the other Defendants in performing the acts alleged in this Complaint.

29.   **MR. ZASLAVSKY** is informed and believes, and based thereon alleges, that at all times relevant to this Complaint, Defendants, and each of them, participated as members of a conspiracy and/or aided and abetted one another in furtherance of the schemes alleged herein, or assisted one another in carrying out the purpose of the conspiracy alleged herein, and have performed acts and made statements in furtherance of the conspiracy, all in violation of both federal, state, and common law. Each of the Defendants acted both individually and in concert with the other Defendants with full knowledge of their respective wrongful conduct.  As such, the Defendants, and each of them, conspired together, building upon each other's wrongdoing, in order to accomplish the acts complained of herein.  Defendants, individually and collectively, are sued as principals, participants, and/or aiders and abettors in the wrongful conduct complained of, and the liability of each arises from the fact that each has engaged in all or part of the improper acts, schemes, plans, conspiracies or transactions complained of herein.

30.   Numerous individuals and separate entities, currently sued as **DOES 1-10**, have actively participated during the course of and in furtherance of the wrongdoing alleged and complained of herein.  The individuals and entities acted pursuant to agreement and in concert with each of the other Defendants in this action, whether specifically identified by name or whether sued under a fictitious name.  Each

COMPLAINT FOR DAMAGES

has also acted as an agent for the principals, in order to advance the objectives of the conspiracy.

31.    **MR. ZASLAVSKY** is presently ignorant of the true names and capacities of Defendants sued as **DOES 1-10**, inclusive, and therefore sues these Defendants by such fictitious names and capacities pursuant to C.D. Cal. Local Rule 19-1.  **MR. ZASLAVSKY** is informed and believes, and on this basis alleges, that each fictitiously named Defendant is responsible in some manner for the alleged acts and failures to act, and that **MR. ZASLAVSKY**'s injuries were legally and proximately caused by the conduct of each such Defendant.  Pursuant to Fed. R. Civ. P. 15(a)(2), and Fed. R. Civ. P. 21, **MR. ZASLAVSKY** will seek leave of the Court to amend this Complaint to allege the true identities of these fictitiously named Defendants, once their name(s) and capacity(ies) are ascertained.  **MR. ZASLAVSKY** will also seek leave of the Court to amend this Complaint pursuant to Fed. R. Civ. P. 15(a)(2) to allege with further specificity the manner in which each fictitiously named Defendant is response for the damages sustained by **MR. ZASLAVSKY**.

## **GENERAL ALLEGATIONS**

32.    Defendants were and/or are responsible for and liable to **MR. ZASLAVSKY** for the events, happenings, and damages hereinafter set forth herein.

**Anti-Semitism and The List-Serve Kerfuffle**

33.    On May 15, 2023, **MR. ZASLAVSKY** participated in a lively, and at times, heated, discussion on one of **CAALA**'s "members only" list serve, to wit, the CAALA-POL list serve.  While **MR. ZASLAVSKY** was not a frequent poster on the CAALA-POL list serve (unlike the CAALA-WORKPRODUCT list serve, where

**MR. ZASLAVSKY** was a very frequent participant), he monitored it regularly and posted when a topic interested him.

34.     The discussion in which **MR. ZASLAVSKY** engaged was one in which members loosely discussed the candidacy of Florida Governor Ron DeSantis for President of the United States.  The discussion was started by **MR. HOFFMAN**, referring to the beleaguered Governor of Florida as "Ron DeSadist," claimed that while he was generally opposed to inflammatory language and name-calling, because Gov. DeSantis was so despicable, **MR. HOFFMAN** stated that was willing to make an exception and therefor refer to the governor by this unpleasant moniker.  Troublingly, the conversation about Florida's governor was quickly hijacked by certain **CAALA** members, including but not limited to **MR. ALLEN**, **MR. HABBAS**, and **MR. HOFFMAN** himself (who routinely boasts about his prominent anti-Israel views) into a sharp and ill-informed criticism of the State of Israel.

35.     Prior to the May 15, 2023 exchange, there were three members of **CAALA** – Defendants **MR. HABBAS**, **MR. MASHNEY**, and **MR. HOFFMAN** – who have consistently, repeatedly, and without any actual facts underlying their untenable positions, attacked Israel, Zionism, and the Jewish people.  Indeed, their collective and individual unfettered hatred of the Jewish people and of the State of Israel has long infected the CAALA-POL list serve, and troublingly, **CAALA**'s leadership has done little to quell this campaign of terror and hate against the Jewish people (including Jewish members of **CAALA**) and of the State of Israel.

36.     At some point a few years ago, **MR. ZASLAVSKY** made the decision to largely disengage from the CAALA-POL website in its entirety to avoid having to deal with the racism and Jew-hatred which was allowed to fester unchecked.  At the time, **MR. ZASLAVSKY** felt that it served him better to just remove himself from that barbaric hatred from ignorant and ill-informed bigots.  **MR. ZASLAVSKY** only recently returned to any level of active participation in that list serve.

COMPLAINT FOR DAMAGES

37.     The issues of anti-Semitism and anti-Zionism are quite personal for **MR. ZASLAVSKY**.  While his great-grandparents on the Zaslavsky side fled Ukraine in 1905 during the pogrom in Pereyaslav (fleeing with their neighbor, famous Yiddish poet and author Sholom Aleichem, whose stories formed the basis for Fiddler on the Roof), and died in Chicago long before the Shoah (Holocaust), many members of **MR. ZASLAVSKY's** family remained in Europe.  **MR. ZASLAVSKY's** other great-grandparents, and in some cases, his great-great-grandparents, left various parts of Eastern Europe, between 1860 and 1921.  **MR. ZASLAVSKY's** last direct bloodline relative left Europe in 1921, when his great-grandparents and great-uncles were able to sneak out **MR. ZASLAVSKY's** then elderly great-great-grandmother, Risa Shapiro, on a ship that left from Riga, Latvia.  Unfortunately, other members of **MR. ZASLAVSKY's** extended family remained in Europe, and ultimately met the same tragic fate as most of Europe's Jewish population.

38.     According to the database maintained by Yad Vashem, the World Holocaust Remembrance Center, which has catalogued nearly 80% of the Jews who were murdered in the Shoah, many of **MR. ZASLAVSKY's** family members were killed, including 929 named Zaslavsky (paternal grandfather's family); 912 named Wernick (maternal grandfather's family); 1,624 named Klinger (maternal grandmother's family); and 16,597 named Shapiro (paternal grandmother's family). There were countless others as well, whose names were changed by marriage.  And while many of the murder victims were distant cousins of **MR. ZASLAVSKY** many times removed, others were from much closer parentela.  Since just over 20,000 members of **MR. ZASLAVSKY's** extended family were brutally murdered in the Shoah, it is indeed a very personal and emotional issue for him.

39.     After the vicious, anti-Zionist and anti-Semitic attacks continued to fester, unchallenged by **CAALA**'s management, leadership, or any of the named Defendants, **MR. ZASLAVSKY** responded – perhaps a bit inarticulately – to the two **CAALA** members who have systematically engaged in some of the most vitriolic

anti-Semitic, anti-Zionist, Jew-hating rhetoric over the past many years, referring to them as "professional Palestinian terrorists."

40. While **MR. ZASLAVSKY** certainly stands by his assessment of the offending individuals, and indeed has seen behavior from them befitting the moniker, **MR. ZASLAVSKY** also recognizes that the strong language used by **all** parties would have been better placed on a forum other than the non-work product CAALA-POL list-serve.  It is troubling that **MR. HOFFMAN**, a long-standing member of **CAALA's** Board of Governors, chose to instigate this discussion on the **CAALA** list serve.  Indeed, it was a discussion that probably would have been far more appropriate on people's personal social media pages.

41. **MR. ZASLAVSKY** was suspended from the CAALA-POL list-serve for a period of 30 days as a result of his comment.  Since **MR. ZASLAVSKY** had no desire to return to the cesspool of Jew-hatred and anti-Semitism that **CAALA** and its leadership allowed to fester on that list serve, he accepted that suspension under the condition that all of the other participants in the discussion – particularly **MR. HOFFMAN**, **MR. MASHNEY**, **MR. HABBAS**, and **MR. ALLEN** – also be suspended for the same amount of time.  **MR. ZASLAVSKY** is informed and believes that only **MR. ALLEN** was suspended for 30 days, and is further informed and believes that **CAALA**'s basis for suspending **MR. ALLEN** was not his anti-Semitic diatribe, but rather for the <u>threats of violence</u> he made against **MR. ZASLAVSKY**.

42. While **MR. ZASLAVSKY** was unfortunately accustomed to seeing the various forms of anti-Semitism that permeated the CAALA-POL list serve, and as bad as the Jew-hatred coming from **MR. MASHNEY** and **MR. HABBAS** has been, and even after the latter had called **MR. ZASLAVSKY** a "MORON" and made other *ad hominem* attacks against him on the list serve, little could prepare **MR. ZASLAVSKY** for the threat on his life that came from member **MR. ALLEN** at 1:02 p.m. on May 15, 2023, wherein **MR. ALLEN** stated:  "BOTH SIDES HAVE

1   COMMITTED ATROCITIES. Don't try and corrupt my written words to suit your

2   stupidity. **You try to pull that shit with me and I will snap you back so hard you'll**

3   **think you're a first-year law student again**."  [sic] (**Emphasis** added.)."

4       43.     This exchange was indeed very much a triggering event for **MR.**

5   **ZASLAVSKY**.

6       44.     When **MR. ZASLAVSKY** received the CAALA-POL list serve

7   suspension notice from **MS. MOORE** just a couple of hours later, he was still reeling

8   from both the noxious, unrestrained anti-Semitic rhetoric that was going around the

9   CAALA-POL list serve, as well as **MR. ALLEN**'s vicious and unwarranted threat on

10  his life.

11      45.     Upon receiving the suspension notice, **MR. ZASLAVSKY** reacted in the

12  unfortunate way that many similarly situated people do, criticizing the messenger

13  rather than the message itself.  However, realizing that his e-mail to **MS. MOORE**

14  was likely too strongly worded, **MR. ZASLAVSKY** drafted and sent a heartfelt

15  apology to **MS. MOORE**.

16      46.     Before **MR. ZASLAVSKY** sent the apology letter to **MS. MOORE**, he

17  also received an e-mail from **MR. NGUYEN**.  **MR. NGUYEN'**s e-mail to **MR.**

18  **ZASLAVSKY** pertinently stated:  "Neal:  Your email to Kwedi Moore is out-of-line.

19  … I trust your email to Kwedi was made in passion. When you calm down, I expect

20  an apology from you to Kwedi.  You are displacing your anger to Kwedi. You are

21  completely in the wrong and better than this.  If you want to discuss, you may call me.

22  My cell is [redacted].  Minh." [sic]  The informal salutation and closing in the e-mail

23  reflects the fact that **MR. NGUYEN** and **MR. ZASLAVSKY** were friends prior to

24  the events complained of herein.  Indeed, it would be fair to say that **MR.**

25  **ZASLAVSKY** was friendly with most of the defendants named herein prior to the

26  events complained of herein.

27

28

COMPLAINT FOR DAMAGES

47.     While **MR. ZASLAVSKY** is aware that **MS. MOORE** received his apology, it is also true that **MS. MOORE** never had the courtesy to acknowledge receipt thereof directly to **MR. ZASLAVSKY**.

48.     Because the entire situation surrounding **MR. ZASLAVSKY's** e-mail to **MS. MOORE** was, quite frankly, *de minimis* in the grand scale, because **MR. ZASLAVSKY** promptly apologized for sending the strongly worded e-mail, because **MR. ZASLAVSKY** accepted the 30-day list-serve suspension, and because **MR. ZASLAVSKY** heard nothing from any of CAALA's leadership for a few weeks thereafter, **MR. ZASLAVSKY** assumed that the matter was rightly and properly closed.  **MR. ZASLAVSKY** was certainly not prepared for what was to come later in June.

**Denial of Due Process and Termination of Membership**

49.     On June 5, 2023, **MR. ZASLAVSKY** received an e-mail from **MR. ABIR** advising him that **CAALA**'s executive committee was proposing to **CAALA's** Board of Governors that **MR. ZASLAVSKY** be expelled from **CAALA** based on a purported violation of the amorphous and vague language of Article II, Section 10, paragraph (a)(iv), of **CAALA**'s by-laws.

50.     **MR. ZASLAVSKY** is informed and believes that the **CAALA** Executive Committee motion to expel him was made by **MR. NGUYEN** and seconded by **MS. SECK**, and that the vote was unanimous, including affirmative votes by **MR. ABIR** and **MS. RAMEY**.

51.     While the very nature of original motion by **CAALA**'s Executive Committee was shocking based on its content, what is even more shocking is that the vote (and appurtenant discussion) included *affirmative* votes and active participation by 2 members of the Executive Committee who never should have participated in the first place.  Indeed, both **MR. ABIR** and **MS. RAMEY** are employed by the law firm (one is managing partner and the other is "of counsel") which recently represented

-14-

**MR. ZASLAVSKY** in litigation related to a denial of insurance benefits during the COVID pandemic.  While these two attorneys recused themselves from the final vote on suspension at **MR. ZASLAVSKY's** insistence, the entire process was tainted by their early involvement in violation of *inter alia* Cal. R. Prof. Cond. 1.9 and 1.10.  Everything that occurred thereafter is fruit of that poisonous tree.  Put differently, instead of protecting **MR. ZASLAVSKY**, as **MR. ABIR** and **MS. RAMEY** most certainly should have done as **MR. ZASLAVSKY**'s prior attorneys, they instead actively worked against his interests.  Indeed, had **MR. ABIR** and **MS. RAMEY** advocated on their client's behalf (or at a bare minimum, recused themselves from the discussion entirely), the outcome of the Executive Committee vote may well have been different, and it certainly would have been reported differently to the Board of Governors.

52.     It is also troubling that the by-law which – at least according to the persons who made the motion – underlies the proposed expulsion (i.e., the "death penalty" from membership in the organization) is vague at best, and would certainly be tossed out by any court reviewing it.  Under the amorphous language of that by-law, not only does it give **CAALA**'s Board the unfettered ability to throw anyone out of the organization for any reason, even for discriminatory reasons, and even if the person otherwise qualifies for membership, *it also fails to provide any reasonable notice to members as to what behaviors, conduct, or actions are covered thereby*.  It is essentially a license to discriminate.

53.     Second, the **CAALA** by-law in question, and even the **CAALA** by-laws taken as a whole, fail to provide *any* real procedures for these hearings, essentially allowing the Executive Committee and Board of Governors the unfettered opportunity to make it up as they go along.  While the by-laws do state that a person has to be notified a certain number of days before a hearing, the specificity stops there.  The by-laws fail to indicate any of the procedural safeguards which are hallmarks of due process.

COMPLAINT FOR DAMAGES

54.     Third, because of the lack of published rules, **MR. ZASLAVSKY** believes that the Executive Committee engaged in conduct with regard to this hearing which runs afoul of traditional notions of due process and fairness.  By way of example, **CAALA** refused to provide **MR. ZASLAVSKY** with any of the documents that he requested, and just a couple of days before the hearing, informed **MR. ZASLAVSKY** that he would have only 5 minutes to present his entire argument.

55.     Troublingly, while **CAALA**'s secretary, **MR. ABIR**, advised **MR. ZASLAVSKY** that he could present his defense *both* in writing and through oral argument, on the eve of the hearing, the **CAALA** President, **MR. NGUYEN**, tried to limit **MR. ZASLAVSKY** to just one of the two methods.  Because there was no established procedure, and because the **CAALA** leadership was just making things up as they went along to try to silence someone with strong religious beliefs, it was not until **MR. ZASLAVSKY** pointed out to **MR. NGUYEN** that **MR. ZASLAVSKY** had already been promised that he could argue both orally and through written advocacy, that **MR. NGUYEN** reluctantly and begrudgingly relented.  Of course, if there had actually been clear written procedures in place, this confusion would have been avoided.

56.     Compounding the denial of due process, **MR. ZASLAVSKY** was denied his request to be represented by counsel and was further denied the ability to call or produce witnesses on his behalf.

57.     Furthermore, it was not until 24 hours before the deadline that **MR. ZASLAVSKY** was even advised of the deadline for submitting written argument and advocacy.  And while the deadline itself *may* have been reasonable had **MR. ZASLAVSKY** been advised at the time of being served with the hearing notice, rather than a week later, again, the lack of clear hearing procedures frankly rendered the entire proceeding to be an absolute mockery of justice.  That this disdain for fairness and justice was promulgated by a trial lawyer's organization which purportedly prides itself on fighting for justice, is, quite frankly, just plain awful.

COMPLAINT FOR DAMAGES

58.     Indeed, none of the **CAALA** lawyers who participated in this sham process would *ever* tolerate this kind of miscarriage of justice in their own practices; it was a travesty of justice that the **CAALA** leadership hypocritically employed despicable methods to prosecute **MR. ZASLAVSKY** using tactics that they would deplore and condemn under any other circumstances.

59.     Importantly, as lawyers fighting for fairness and justice, we look at the totality of circumstances, we consider mitigating factors, and we expect any transgressions – whether civil or criminal – be "punished" in a manner that is consistent and proportionate to the purportedly offending actions.  We do not look at any single issue in a vacuum, as that is a recipe for injustice.  Unfortunately, what **CAALA** and the other defendants did to **MR. ZASLAVSKY** was indeed an injustice.

60.     The hearing – which was conducted via Zoom because **MR. NGUYEN** was vacationing in Paris at the time of the hastily called hearing – was conducted on June 15, 2023.  **MR. ZASLAVSKY** was indeed given only 5 minutes to present his case, and there was no indication that his written argument had actually been reviewed by most of the Board in advance of the sham hearing.  After 5 minutes of oral advocacy, **MR. ZASLAVSKY** was advised that his time had expired.

61.     After **MR. ZASLAVSKY** had presented his argument, there was a brief question and answer period, wherein **MR. ZASLAVSKY** responded to questions from members of **CAALA's** Board of Governors.  The only question that he refused to answer was the one that came from defendant **MR. HOFFMAN**, as **MR. HOFFMAN**'s participation in the May 15, 2023 discussion on the CAALA-POL list serve had been extremely hostile and toxic, and his question was inappropriate, impertinent, and irrelevant.  Had an attorney actually asked a witness such an inappropriate, impertinent, and irrelevant question in a court hearing, not only would it have drawn countless objections from opposing counsel, but it likely would have led to a finding of contempt against **MR. HOFFMAN**.

COMPLAINT FOR DAMAGES

62.     Shockingly, when **MS. TREPINSKI** was questioning **MR. ZASLAVSKY** during the hearing, she attempted to belittle him, laughed at him, and contended that **MR. ALLEN**'s threats towards **MR. ZASLAVSKY** were not real threats.  Apparently, to **MS. TREPINSKI**, a threat to "**snap you back so hard**" is not really a threat – at least when it comes from an anti-Semite like **MR. ALLEN** towards a Jew like **MR. ZASLAVSKY**.  One must wonder how **MS. TREPINSKI** would respond if such a vicious and vile threat were directed at her.

63.     Troublingly, when **MR. ZASLAVSKY** politely and respectfully refused to answer **MR. HOFFMAN**'s question (and again, there were no established or written procedures that actually required **MR. ZASLAVSKY** to answer *any* questions, and indeed, **MR. ZASLAVSKY** voluntarily answered the other questions in an act of cooperation and transparency), **MR. HOFFMAN** moved the Board to cut off all further questioning and to adjourn to executive session to begin deliberations.  Fortunately, the chair did allow those with pending questions to ask their questions, over **MR. HOFFMAN**'s unpleasant and discourteous objection.

64.     Several hours later, at 11:44 p.m. on June 15, 2023, **MR. NGUYEN** sent **MR. ZASLAVSKY** an e-mail advising him that the Board had voted to terminate his membership in **CAALA** and to ban him from future **CAALA** events.  Notably, the second part of the motion (i.e., banning **MR. ZASLAVSKY** from future **CAALA** events) was not part of the original "charge," nor was **MR. ZASLAVSKY** ever advised that this was even up for consideration.  And because **MR. ZASLAVSKY** was never advised that this even more draconian measure was being considered, neither his written nor his oral argument even addressed this.

65.     **MR. NGUYEN**'s language to **MR. ZASLAVSKY** was harsh, and even threatened to have him arrested if he was ever present anywhere near a **CAALA** event.  Since **CAALA** allows guests at most of its events, and since **MR. ZASLAVSKY** would have entitled to attend many **CAALA** events by virtue of his membership in other trial lawyer organizations like AAJ, this was quite a blow to

COMPLAINT FOR DAMAGES

**MR. ZASLAVSKY**, who routinely used **CAALA** events and activities for Continuing Legal Education ("CLE"), networking, business development, camaraderie, and other important functions to his business and profession.

66.     **MR. ZASLAVSKY** is informed and believes that other than **MR. ALLEN**'s 30-day suspension from the **CAALA-POL** list serve, no other action was taken against any of the other persons who participated in the discussion on the list serve.  **MR. ZASLAVSKY** is also informed and believes that of the people who were engaged in that discussion, he is the only person who is a practicing Jew, and the only person who had relatives die in the Holocaust.

**Mr. Zaslavsky's Goals Were In The Best Interests of CAALA**

67.     While the language of **MR. ZASLAVSKY**'s e-mail to **MS. MOORE** – right after he had been triggered by the ***threats on his life*** and the continued anti-Semitic rhetoric of certain individuals – may have been intemperate, there is actually a strong argument that his goal was indeed designed to advance "the preservation of [**CAALA's**] reputation, good will, character."  Indeed, according to **CAALA**'s mission statement (as retrieved from www.caala.org today), **CAALA** "believe[s] in … justice[,] …[i]nclusion[,]… justice for all people who have been wronged, harmed, or abused[,] … [and promoting] diversity and inclusion of historically underrepresented groups.

68.     The by-law at issue here pertinently provides that "…[if] continued participation by the member in this corporation as a member is not in the best interests of this corporation and the furtherance of its purposes, such member's membership in this corporation shall terminate. The best interests of this corporation include the orderly, dignified, and harmonious conduct of its business; the preservation of its reputation, good will, character, and property; and adherence to its governing instruments, and policies and procedures determined by the Board of Governors."

69.     Notably, Jews are a historically underrepresented group.  Jewish people have been excluded from law firms, country clubs, C-suite positions in big companies, certain neighborhoods, and various public accommodations.  Six million Jews were systematically and brutally **murdered** in World War II for no other reason other than their being Jewish.  And in the past year, more than half of all religiously motivated hate crimes have been directed at Jews.  **Context matters**.

70.     And while **CAALA**'s Executive Committee essentially **accused MR. ZASLAVSKY** of calling **MS. MOORE** an anti-Semite, a careful read of **MR. ZASLAVSKY's** e-mail to her makes no accusations, but instead asks **MS. MOORE** whether she will be siding with anti-Semites, or, alternatively, whether she will stand with those of us who adhere to the teachings of the Rev. Dr. Martin Luther King, Jr., who famously stated that anti-Zionism is anti-Semitism.

71.     Dr. King is a personal hero of **MR. ZASLAVSKY**, and he does try to live by Dr. King's teachings.  Dr. King was a good friend to Israel, and indeed many of the people who marched for civil rights with Dr. King were Jewish clergy and community leaders.  That is why **MR. ZASLAVSKY**'s e-mail to **MS. MOORE** included a reference to Dr. King's brilliant words and teachings.

72.     Indeed, while **MR. ZASLAVSKY**'s e-mail to **MS. MOORE** may not have been particularly well-stated because he had just been triggered by the *threats on his life*, he was merely looking to see which side of the issue of anti-Semitism and anti-Zionism **MS. MOORE** adhered to.  If **MS. MOORE** were on what **MR. ZASLAVSKY** viewed as being on the correct side of the issue, i.e., opposed to anti-Semitism and its companion breed of hatred and anti-Zionism, then **MR. ZASLAVSKY** would have been satisfied with her response.  If, however, **MS. MOORE** sided with the folks who want to see the modern State of Israel disappear and the Jews of Israel thrown into the Mediterranean Sea[1], then her position would

---

[1] "From the river to the sea" is a common, but despicable rallying cry of those who advocate for the dismantling of the modern Jewish State founded in 1948 after the

have been inconsistent with an organization which prides itself on its commitment to diversity, equality, and inclusion, and **MR. ZASLAVSKY** likely would have taken further action by asking the Executive Committee or Board of Governors to investigate.

73.    Notably, **MR. ZASLAVSKY** very much believes that ensuring that the day-to-day management of **CAALA** is being helmed by someone who shares Dr. King's values is consistent with preserving the reputation, goodwill, will, character of **CAALA**.

## COUNT ONE

## UNLAWFUL DISCRIMINATION IN PUBLIC ACCOMMODATION IN VIOLATION OF 42 U.S.C. § 2000a

(Brought Against Defendant **CAALA** only)

74.    **MR. ZASLAVSKY** realleges and incorporates by reference the allegations contained within paragraphs 1 through 73, inclusive, supra, of this Complaint into this first claim for relief as though each paragraph supra were fully set forth and stated within this paragraph.

75.    Under Title II of the Civil Rights Act of 1964, "[a]ll persons shall be entitled to the full and equal enjoyment of the goods, services, facilities, privileges, advantages, and accommodations of any place of public accommodation, as defined in this section, without discrimination or segregation on the ground of race, color, **religion**, or national origin."  The United States Supreme Court has held that an establishment subject to this law "includes not only a fixed location, … but also a

---

Shoah on the historical lands of the Jewish people.  Indeed, this rallying cry calls for the Palestinians to forcibly remove all Jewish people from the land running from the Jordan River to the Mediterranean Sea, i.e., all of the modern State of Israel.

COMPLAINT FOR DAMAGES

permanent commercial force or organization or a permanent settled position (as in life or business)."  As such, **CAALA** is a corporation which is subject to Title II of the Civil Rights Act of 1964.

76.     Indeed, **CAALA** has multiple businesslike attributes, including its complex structure, large staff and budget, multiple events, and extensive publishing activities.

77.     Through the acts and omissions more fully described herein, **CAALA** discriminated against **MR. ZASLAVSKY** on the basis of his religion, treated him disparately because of his religion and the beliefs and values associated with that religion, and denied **MR. ZASLAVSKY** equal access to a public accommodation.

78.     **MR. ZASLAVSKY** has been damaged by **CAALA's** discriminatory and unlawful practices in an amount to be proven at trial.

## COUNT TWO

### UNLAWFUL DISCRIMINATION IN VIOLATION OF
### THE UNRUH CIVIL RIGHTS ACT, CAL. CIV. CODE §§ 51, 52

(Brought Against Defendant **CAALA** only)

79.     **MR. ZASLAVSKY** realleges and incorporates by reference the allegations contained within paragraphs 1 through 78, inclusive, supra, of this Complaint into this second claim for relief as though each paragraph supra were fully set forth and stated within this paragraph.

80.     **CAALA**, by and through its termination of **MR. ZASLAVSKY**'s membership and banning him from being present at any **CAALA** events – even as a guest of another **CAALA** member – has unlawfully discriminated against **MR. ZASLAVSKY,** thereby denying him of full and equal accommodations, advantages, privileges, and services.

COMPLAINT FOR DAMAGES

81.   A substantial and motivating factor for **CAALA's** discriminatory and proscribed acts and omissions was the fact that **MR. ZASLAVSKY** is a practicing, pro-Israel member of the Jewish religion.

82.   **MR. ZASLAVSKY** was harmed by **CAALA's** discriminatory and proscribed acts and omissions as more fully described herein, and continues to be harmed by these acts and omissions.  Unless the Court enjoins **CAALA** from further discriminatory and proscribed acts and omissions against **MR. ZASLAVSKY**, including but not limited to requiring **CAALA** to readmit **MR. ZASLAVSKY** to active membership and revoking the ban on his attendance at **CAALA** events, **MR**. **ZASLAVSKY** will continue to be damaged and harmed to a much greater extent into the future.

83.   **CAALA's** conduct has been and continues to be a substantial factor in causing and perpetuating **MR**. **ZASLAVSKY's** damages.

84.   **MR. ZASLAVSKY** has been damaged by **CAALA's** discriminatory and unlawful practices in an amount to be proven at trial.

### COUNT THREE

**DISCRIMINATION IN BUSINESS DEALINGS,**

**IN VIOLATION OF CAL. CIV. CODE §§ 51.5**

(Brought Against All Defendants)

85.   **MR. ZASLAVSKY** realleges and incorporates by reference the allegations contained within paragraphs 1 through 84, inclusive, supra, of this Complaint into this third claim for relief as though each paragraph supra were fully set forth and stated within this paragraph.

86.   **MR. ZASLAVSKY** was denied his full and equal rights to conduct business because of his Jewish religion.  Indeed, the Defendants, and each of them,

revoked **MR. ZASLAVSKY**'s membership in **CAALA** and banned him from being present at any **CAALA** event because of his religious beliefs.

87.     **MR. ZASLAVSKY** believes that a substantial motivating reason for each of the Defendants' conduct was their perception regarding **MR. ZASLAVSKY's** religious beliefs and the fact that he is a practicing, pro-Israel Jew.

88.     **MR. ZASLAVSKY** was and continues to be harmed by the Defendants' actions and conduct, and the Defendants' conduct, as more fully described herein, was and continues to be a substantial factor in causing **MR. ZASLAVSKY's** harm and damages.

89.     **MR. ZASLAVSKY** has been damaged by the Defendants' discriminatory and unlawful practices in an amount to be proven at trial.

## COUNT FOUR

### THREATS OF VIOLENCE IN VIOLATION OF
### THE RALPH CIVIL RIGHTS ACT, CAL. CIV. CODE §§ 51.7
(Brought Against Defendant **MR. ALLEN** only)

90.     **MR. ZASLAVSKY** realleges and incorporates by reference the allegations contained within paragraphs 1 through 73, inclusive, <u>supra</u>, of this Complaint into this fourth claim for relief as though each paragraph <u>supra</u> were fully set forth and stated within this paragraph.

91.     As noted above, at approximately 1:02 p.m. on May 15, 2023, **MR. ALLEN** stated to **MR. ZASLAVSKY**:  "Don't try and corrupt my written words to suit your stupidity. **You try to pull that shit with me and I will snap you back so hard you'll think you're a first-year law student again**."  [sic] (**Emphasis** added.)."

92.     This intentional threat by **MR. ALLEN** to **MR. ZASLAVSKY** was indeed very much a triggering event for **MR. ZASLAVSKY,** and **MR.**

ZASLAVSKY reasonably believed that **MR. ALLEN** might follow through on his threat of violence.

93.     A substantial and motivating reason for **MR. ALLEN**'s threats of violence and intimidation towards **MR. ZASLAVSKY** was **MR. ZASLAVSKY's** Jewish faith.

94.     A reasonable person in **MR. ZASLAVSKY's** position would certainly have been intimidated by **MR. ALLEN**'s threats and acts of intimidation, and indeed, a reasonable person in **MR. ZASLAVSKY**'s position would also have believed that **MR. ALLEN** would carry out his threat.

95.     **MR. ZASLAVSKY** was harmed by **MR. ALLEN**'s threats and intimidation, and **MR. ALLEN**'s conduct was a substantial factor in causing **MR. ZASLAVSKY**'s harm.

96.     **MR. ZASLAVSKY** has been damaged by **MR. ALLEN**'s discriminatory and unlawful practices in an amount to be proven at trial.

## <u>COUNT FIVE</u>

### **VIOLATIONS OF THE BANE ACT, CAL. CIV. CODE §§ 52.1**

(Brought Against Defendant **MR. ALLEN** only)

97.     **MR**. **ZASLAVSKY** realleges and incorporates by reference the allegations contained within paragraphs 1 through 96, inclusive, <u>supra</u>, of this Complaint into this fifth claim for relief as though each paragraph <u>supra</u> were fully set forth and stated within this paragraph.

98.     Defendant **MR. ALLEN** intentionally and deliberately interfered with **MR. ZASLAVSKY**'s civil rights through his threats, intimidation, and coercion.

99.     By and through his threats, intimidation, and coercion, as more fully detailed herein, **MR. ALLEN** caused **MR**. **ZASLAVSKY** to reasonably believe that if he continued to exercise his right to practice his Jewish faith, that **MR. ALLEN**

would commit violence against him.  Due to **MR. ALLEN**'s actions, **MR**. **ZASLAVSKY** reasonably believed that **MR. ALLEN** had the apparent ability to carry out his threats.  Indeed, and as noted hereinabove, **MR. ZASLAVSKY** shared his well-founded fear with the other defendants, both in writing and through his oral testimony.

100.   **MR. ALLEN** intended to deprive **MR**. **ZASLAVSKY** of his enjoyment of the right to freely practice his religion, thereby causing significant harm to **MR**. **ZASLAVSKY.  MR. ALLEN's** actions were a substantial factor in causing **MR**. **ZASLAVSKY's** harm.

101.   **MR. ZASLAVSKY** has been damaged by **MR. ALLEN**'s actions and his discriminatory and unlawful practices in an amount to be proven at trial.

## COUNT SIX

### INTENTIONAL INTERFERENCE WITH

### PROSPECTIVE ECONOMIC RELATIONS

(Brought Against Defendants

**MR. NGUYEN**; **MS. SECK**; **MR. AARONS**; **MS. HERNANDEZ**; **MS. RAMEY**; **MR. ABIR**; **MS. TREPINSKI**; **MR. HOFFMAN**; **MS. MOORE**; **MR. MASHNEY**; **MR. HABBAS**; and **MR. ALLEN**)

102.   **MR**. **ZASLAVSKY** realleges and incorporates by reference the allegations contained within paragraphs 1 through 73, inclusive, <u>supra</u>, of this Complaint into this sixth claim for relief as though each paragraph <u>supra</u> were fully set forth and stated within this paragraph.

103.   **MR**. **ZASLAVSKY** was in an economic relationship with both **CAALA** and various attorney members of **CAALA**, including but not limited to the more than one thousand attorneys who actively participate in **CAALA's** work product list serve

COMPLAINT FOR DAMAGES

and the nearly three thousand attorneys who attend **CAALA's** annual convention in Las Vegas.

104.   **MR**. **ZASLAVSKY**'s law practice routinely received economic advantages from his membership in **CAALA**, and his participation in various activities, including but not limited to:  posting on the **CAALA** work product list serve and reviewing other attorney's posts on the **CAALA** website; posting documents in **CAALA's** document bank and reviewing documents in the document bank which were posted by other attorneys; attending **CAALA's** annual conference and various other educational events and interacting therein with other attorneys, judges, and vendors; and participating in **CAALA**'s "$200/hour mediator" program. Each of these activities created economic benefits for **MR**. **ZASLAVSKY** including but not limited to receiving referrals, making referrals to better serve his clients, generating mediation business, and learning valuable trial, pre-trial, and other skills.

105.   The Defendants, and each of them, were well aware of the relationship. Indeed, **MR**. **ZASLAVSKY** had been a member of **CAALA** for approximately fifteen (15) years at the time that he was unceremoniously expelled from **CAALA**, and was well acquainted with nearly all of the Defendants.  Indeed, in the lead up to the termination hearing, several of the Defendants and their allies commented to **MR. ZASLAVSKY** that they were well aware of his involvement in the activities listed herein.

106.   By discriminatorily and unwarrantedly terminating **MR. ZASLAVSKY's** membership in **CAALA** and banning him from being present at any **CAALA** event, Defendants **MR. NGUYEN**; **MS. SECK**; **MR. AARONS**; **MS. HERNANDEZ**; **MS. RAMEY**; **MR. ABIR**; **MS. TREPINSKI**; **MR. HOFFMAN**; **MS. MOORE**, and each of them, intended to, and indeed did disrupt **MR. ZASLAVSKY's** economic relationships.  Indeed, by not only terminating **MR. ZASLAVSKY's** membership in **CAALA**, but by banning him from being present at any **CAALA** event, these Defendants, and each of them certainly knew that this

COMPLAINT FOR DAMAGES

disruption was certain[2].  Notably, based on **MR**. **ZASLAVSKY's** continued membership in other related bar organizations, without the unfounded ban on his presence at **CAALA** events, he still would have been entitled to attend various events and functions, including one of the most important educational and networking events – the annual convention in Las Vegas, and further would have been entitled to attend most other **CAALA**-related events.

107.   The disruption in **MR**. **ZASLAVSKY's** economic relationship with **CAALA** and the approximately 3,000 lawyers and judges who attend the annual convention over Labor Day weekend in Las Vegas, and the more than 1,000 lawyers who participate in the **CAALA** work product list serve has caused and will continue to cause harm to **MR**. **ZASLAVSKY.**

108.   The conduct of the defendants named within this claim for relief, and each of them, was a substantial factor in causing **MR**. **ZASLAVSKY's** harm.

109.   **MR. NGUYEN**; **MS. SECK**; **MR. AARONS**; **MS. HERNANDEZ**; **MS. RAMEY**; **MR. ABIR**; **MS. TREPINSKI**; and **MR. HOFFMAN's** proscribed conduct included, but was not limited to participating in and voting to revoke **MR**. **ZASLAVSKY's** membership in **CAALA** and to ban him from being present at any **CAALA**-related event, all while conspiring with **MS. MOORE** for the same; denying **MR. ZASLAVSKY** any semblance of due process; and publicly shaming and attempting to bring opprobrium unto **MR. ZASLAVSKY** without good cause therefor.

110.   In addition to the conduct described in Paragraph 109, <u>supra</u>, **MR. NGUYEN**; **MS. SECK**; **MR. AARONS**; **MS. HERNANDEZ**; **MS. RAMEY**; and **MR. ABIR's** proscribed conduct also included, but was not limited to:  participating

---

[2] Mr. Zaslavsky does not concede that the **CAALA**-imposed ban on his presence at public venues where **CAALA** may be holding events is either valid or enforceable; nonetheless, for the purposes of this Complaint, Mr. Zaslavsky merely notes that this unfortunate decision has been rendered by **CAALA's** Board of Governors.

COMPLAINT FOR DAMAGES

in Executive Committee meetings and conspiring with other members of the **CAALA** Executive Committee for the sole purpose of discriminating against, retaliating against, and disrupting the economic relationships of **MR. ZASLAVSKY**.

111.   In addition to the conduct described in Paragraphs 109 and 110, <u>supra</u>, **MR. NGUYEN** and **MS. SECK's** proscribed conduct also included, but was not limited to:  bringing forth a motion in **CAALA's** Executive Committee for the purpose of discriminating against, retaliating against, and disrupting the economic relationships of **MR. ZASLAVSKY,** conspiring with **MS. MOORE** to accomplish the same, and denying **MR. ZASLAVSKY** any semblance of due process.

112.   In addition to the conduct described in Paragraph 109 and 110, <u>supra</u>, **MS. RAMEY** and **MR. ABIR's** proscribed conduct also included, but was not limited to:  participating in discussions and voting affirmatively in CAALA's Executive Committee on **MR. NGUYEN**, **MS. SECK**, and **MS. MOORE**'s motion to terminate **MR. ZASLAVSKY's** membership in **CAALA** and to ban him from **CAALA**-related events, despite the fact that **MS. RAMEY** and **MR. ABIR's** law firm previously represented **MR. ZASLAVSKY** in a business matter, and as such, had an affirmative duty to not act against **MR. ZASLAVSKY's** best interests. Clearly, losing his **CAALA** membership and being banned from **CAALA**-related events is not in **MR. ZASLAVSKY**'s best interests, and **MS. RAMEY** and **MR. ABIR's**, as experienced licensed attorneys, should have known that their actions were not in the best interests of their client, and indeed, ran counter to their client's best interests.

113.   **MS. MOORE's** proscribed conduct also included, but was not limited to: conspiring with and demanding that **MR. NGUYEN**; **MS. SECK**; **MR. AARONS**; **MS. HERNANDEZ**; **MS. RAMEY**; **MR. ABIR**; **MS. TREPINSKI**; and **MR. HOFFMAN** terminate **MR. ZASLAVSKY**'s membership in **CAALA** and ban him from being present at any **CAALA**-related event.

114.   In addition to the conduct described in Paragraph 109 and 110, <u>supra</u>, as to **MR. HOFFMAN** only, **MR. HOFFMAN**; **MR. MASHNEY; MR. HABBAS; and MR. ALLEN's** proscribed conduct also included, but was not limited to: harassing, threatening, discriminating and ridiculing **MR. ZASLAVSKY** on the **CAALA-POL** list serve.

## COUNT SEVEN

### NEGLIGENT INTERFERENCE WITH
### PROSPECTIVE ECONOMIC RELATIONS

(Brought Against Defendants

**MR. NGUYEN**; **MS. SECK**; **MR. AARONS**; **MS. HERNANDEZ**; **MS. RAMEY**; **MR. ABIR**; **MS. TREPINSKI**; **MR. HOFFMAN**; **MS. MOORE; MR. MASHNEY; MR. HABBAS; and MR. ALLEN**))

115.   **MR**. **ZASLAVSKY** realleges and incorporates by reference the allegations contained within paragraphs 1 through 72, inclusive, <u>supra</u>, of this Complaint into this seventh claim for relief as though each paragraph <u>supra</u> were fully set forth and stated within this paragraph.

116.   **MR. ZASLAVSKY** further realleges each allegation in the sixth claim for relief, <u>supra</u>, and specifically realleging the entirety of ¶¶103-114.

117.   In addition to the allegations in the sixth claim for relief, <u>supra</u>, and ¶¶103-114, **MR. ZASLAVSKY** contends that the Defendants, and each of them, named in both the sixth and seventh claims for relief knew, or certainly should have known, that **MR. ZASLAVSKY**'s economic relationships would be disrupted if each failed to act with reasonable care, and indeed, each of them did in fact fail to act with reasonable care.

///
///

COMPLAINT FOR DAMAGES

**WHEREFORE**, **MR**. **ZASLAVSKY** prays for judgment as follows:

a.      For statutory damages in an amount not less than four thousand dollars ($4,000) per defendant for each act in violation of the Unruh Civil Rights Act, each act in violation of 42 U.S.C. 2000a, and each act in violation of Cal. Civ. Code § 51.5, all pursuant to Cal. Civ. Code § 52(a);

b.      For statutory damages in an amount not less than twenty-five thousand dollars ($25,000) per defendant for each act in violation of the Ralph Civil Rights Act, pursuant to Cal. Civ. Code § 51.7 and Cal. Civ. Code § 52(b)(2) as to **MR. ALLEN** only;

c.      For statutory damages in an amount not less than four thousand dollars ($25,000) per defendant for each act in violation of the Tom Bane Civil Rights Act, pursuant to Cal. Civ. Code § 52.1(b) as to **MR. ALLEN** only;

d.      For compensatory damages pursuant to Cal. Civ. Code § 52(b);

e.      For exemplary damages pursuant to Cal. Civ. Code § 52.1(b)(1);

f.      For consequential damages, based on all injuries and losses that proximately flowed from Defendants' violations of law, including the substantial lost income and profits suffered by **MR. ZASLAVSKY** while he was subjected to the unlawful conduct of the Defendants, in an amount according to proof at trial;

g.      For all reasonable attorneys' fees and costs that **MR. ZASLAVSKY** has been forced to incur in preparing, filing, and prosecuting this suit pursuant to *inter alia* 42 U.S.C.A. § 2000a-3(b); Cal. Civ. Code § 52(b)(3); and Cal. Civ. Code § 52.1(i);

h.      For injunctive relief to permit **MR. ZASLAVSKY** to enjoy the full enjoyment of his rights, including but not limited to an order requiring **CAALA** to reinstate **MR. ZASLAVSKY**'s membership in **CAALA** with all privileges related thereto, including but not limited to the ability to be present at **CAALA**-related events, participate in work product list serves, and access other **CAALA** educational, professional development, and networking opportunities;

COMPLAINT FOR DAMAGES

1       i.    For injunctive relief, proscribing the Defendants, and each of them from

2   engaging in any discriminatory conduct against **MR. ZASLAVSKY** based on his

3   religious beliefs, practices, and values;

4       j.    For any such further relief that the Court deems to be just and proper.

6   

**DEMAND FOR A JURY TRIAL**

7   **MR. ZASLAVSKY** demands a jury trial on all causes of action triable by jury.

9   Dated:  August 8, 2023          **LAW OFFICE OF NEAL S. ZASLAVSKY,**

10                             **A PROFESSIONAL CORPORATION**

12   **By:** _____

13                 Neal S. Zaslavsky, Esq.,

14                 *Attorneys for Plaintiff, Neal S. Zaslavsky*

COMPLAINT FOR DAMAGES